UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

THE HONORABLE TERRY PETTEWAY,                 CIVIL ACTION
et al.,

     Plaintiffs,

V.                                            NO.  11-511

THE HONORABLE MARK HENRY, et al.,

     Defendants.

## **ORDER**

Before the court is the plaintiffs' application for a temporary restraining order and injunction. The district court's previous order granting a temporary restraining order is VACATED. The motion for a preliminary injunction is held for resolution until after December 13, 2011.[1]

## I

This is a Voting Rights Act case arising out of redistricting in Galveston County following the 2010 Census. Galveston County, the defendant, has adopted new redistricting plans for county commissioner, justice of the peace and constable districts.[2] The Voting Rights Act, which applies to Texas and its political subdivisions, requires Galveston County to first obtain judicial or administrative preclearance before implementing a voting change, including a reapportionment plan. 42 U.S.C. § 1973c; *McDaniel v. Sanchez*, 452 U.S. 130, 137 (1981). Specifically, § 5 of the Voting

---

[1]  Judge Kenneth Hoyt has dissented from this order.

[2]  County Judge Mark Henry, sued in his official capacity as Galveston County's Chief Officer, is also a defendant.

1

Rights Act requires Galveston County to either (1) submit the proposed change to the Attorney General of the United States, who must then object to the plan within sixty days; or (2) file a declaratory judgment action in the U.S. District Court for the District of Columbia. *McDaniel*, 452 U.S. at 137. Plaintiffs concede that if the Attorney General does not interpose an objection within sixty days of the plan's submission to the Department of Justice, Galveston County may implement its plans in future elections. *See* 28 C.F.R. §51.1(a)(2). It is undisputed that Galveston County submitted for preclearance its new plan for the commissioners election to the Department of Justice on October 14, 2011.[3] But it is also undisputed that preclearance has not yet occurred. Galveston County maintains that it has no intention of enforcing the plans without first obtaining preclearance.

Plaintiffs are one citizen and seven elected officials in Galveston County, all of whom are registered to vote in that county. The plaintiffs assert that preclearance under § 5 of the Voting Rights Act likely will not occur before December 15, 2011, the deadline for filing to run for office in Galveston County.[4] Asserting that Galveston County's new redistricting plans are therefore unlawful, the plaintiffs moved the district court for a temporary restraining order and preliminary injunction to prevent their implementation. Also involved in this lawsuit are three citizens and registered voters who have intervened, claiming effects from Galveston County's newly adopted plans.

The district court granted a temporary restraining order against implementation of Galveston

---

[3] Galveston County also has sought preclearance from the D.C. court. *See Galveston Cnty., Tex. v. United States*, No. 1:11-CV-01837. The answer to that case is due on December 18, 2011. Galveston County submitted for preclearance its justice of the peace and constable redistricting plans on October 19, 2011. The parties assert that a preclearance response is anticipated by either December 15 or 19, 2011. These elections do not face the same obstacles as those in the commissioners elections, for the reasons discussed in footnote 4 below.

[4] The litigation addressing state-wide redistricting in the State of Texas set the deadline for filing for elections as December 15, 2011. *See Perez v. State*, No. 5:11-CA-00360 (W.D. Tex. Nov. 4, 2011).

County's new plans.   The Voting Rights Act charges this three-judge panel with more fully evaluating the plaintiffs' request for an injunction.   28 U.S.C. § 2284 (An order previously ruled upon by a single judge in a three-judge matter, "unless previously revoked by the district judge, shall remain in force only until the hearing and determination by the district court of three judges of an application for a preliminary injunction.").   The panel's review encompasses determining "what temporary remedy, if any, is appropriate," pending the plans' preclearance.   *Lopez v. Monterey Cnty., Calif.*, 519 U.S. 9, 23 (1996).   The plaintiffs and intervenors have submitted for the panel's consideration proposed interim redistricting plans to govern the upcoming elections.

## II

Although plaintiffs do not dispute that Galveston County's request for preclearance is pending, they assert that Galveston County did not submit its request for preclearance in a timely manner.   Plaintiffs further maintain that preclearance is unlikely to be granted and urge the imposition of their proposed interim voting plan to govern upcoming elections.[5]   Galveston County maintains that this court's intervention is premature.   Galveston County has made clear it has no intention of implementing its redistricting plans without first obtaining preclearance.   Galveston County further asserts that it is highly likely that it will obtain preclearance in time to allow elections for County Commissioners to be held under districts submitted for preclearance.

We find that any action on plaintiffs' motion is premature until after December 13, 2011. Section 5 of the Voting Rights Act does not grant this court authority to determine whether a voting

---

[5] Its proposed plan would govern the commissioner elections only.   The plaintiffs concede that the justices of the peace and constable redistricting need not comply with the Constitution's one-vote, one-person principle, and that if the Department of Justice does not grant preclearance, elections may proceed under old plans. *See Chisom v. Roemer*, 501 U.S. 380 (1981) (noting only that the one-person, one-vote principle does not apply to judicial elections).   Despite this distinction, we need not assess the validity of remedies at this phase.

change was adopted with a discriminatory purpose and whether it would have a discriminatory effect on minority voting strength. *Lopez v. Monterey Cnty., Calif.*, 519 U.S. 9, 23–24 (1996). The Act reserves that substantive determination exclusively for the U.S. Department of Justice and the U.S. District Court for the District of Columbia. *Id.* Our role is strictly limited:

> [We] may determine only [1] whether § 5 covers a contested change, [2] whether § 5's approval requirements were satisfied, and [3] if the requirements were not satisfied, what temporary remedy, if any, is appropriate. The goal of a three-judge district court facing a § 5 challenge must be to ensure that the covered jurisdiction submits its election plan to the appropriate federal authorities for preclearance as expeditiously as possible.

*Id.* (citations omitted).

Plaintiff has not shown that these requirements are met. Although it is undisputed that § 5 applies to Galveston County's reapportionment plan, plaintiffs have not shown that § 5's approval requirements were not satisfied. Section 5 demands our intervention only where a legislative body has failed to seek preclearance for a voting change. *See* 42 U.S.C. § 1973c. Galveston County has followed the statute's terms by seeking the approval of the Department of Justice and the District of Columbia District Court. Plaintiffs' request that we impose an interim plan is premature.[6] We cannot properly consider "what temporary remedy, if any, is appropriate," *see Lopez*, 519 U.S. at 23, without first allowing the Department of Justice or the District of Columbia District Court to assess the validity of Galveston County's plans. Our "goal [when] facing a § 5 challenge must be to ensure

---

[6] It does not matter that Galveston County has not yet received preclearance—only that it has requested it. Further, it appears that preclearance, or an objection to implementation, will occur before the deadline to file for elections. By statute, the Department of Justice has sixty days from the time Galveston County submitted its reapportionment plan to object to it. *See id.* The deadline to register to run in these elections is not until December 15, 2011. *See Perez v. State*, No. 5:11-CA-00360 (W.D. Tex. 2011). Galveston County submitted its plans to the Justice Department for preclearance on October 14, 2011. If the Justice Department does not object to Galveston County's plans sixty days from that date—by December 13, 2011—Galveston County will receive the preclearance it needs in order to move forward with elections under its newly-adopted reapportionment plans. *See id.*

that the covered jurisdiction submits its election plan to the appropriate federal authorities for preclearance as expeditiously as possible." *Id.* at 24. That has already been done.  Any remedial action on our part before December 13, 2011 would disregard the limited authority the Voting Rights Act grants us. *See id.;* 42 U.S.C. § 1973c.

IT IS THEREFORE ORDERED:  The district court's previous order granting the plaintiffs' temporary restraining order is VACATED pending our further review.

IT IS FURTHER ORDERED: Any person wishing to stand for election as county commissioner, justice of the peace, or constable of Galveston County, Texas in the primary currently scheduled for March 6, 2011 may file for election under the unprecleared plan, with the understanding that if the U.S. Department of Justice or U.S. District Court for the District of Columbia disallow preclearance by the end of the day on December 15, 2011, their filing fees will be refunded, and this three-judge court will determine what temporary remedy to adopt at that time.[7]

December 9, 2011

EMILIO M. GARZA
UNITED STATES CIRCUIT JUDGE

MELINDA HARMON
UNITED STATES DISTRICT JUDGE

---

[7] If forced to craft an interim remedy, this court has the authority to postpone these local election deadlines if necessary. *See Perez v. State,* No. 5:11-CA-00360 (W.D. Tex. Nov. 4, 2011).

I, Kenneth M. Hoyt, respectfully dissent:

## I.    INTRODUCTION

Before the Court is the plaintiffs' application for a temporary restraining order and preliminary injunction and supporting memorandum (Docket Entry No. 2) and the defendants' response (Docket Entry No. 7). The plaintiffs, the Honorable Terry Petteway, Derreck Rose, Michael Montez, Penny Pope, Sonny James and Roosevelt Henderson, are justices of the peace serving in Galveston County, Texas. The Honorable Stephen Holmes and Patrick Doyle serve Galveston County as county commissioners for districts[1] 3 and 1, respectively. The defendants are Galveston County, Texas and the Honorable Mark Henry, the at-large county judge. Also, joining this suit are intervenors Timothy Paulissen, Todd Kinsey and Heidi Thiess.[2]

I have reviewed the pleadings and memoranda filed by the parties, the testimony and exhibits presented and admitted and am of the opinion that the plaintiffs' request, to draw an interim map, modifying the "Benchmark Map,"[3] addressing the existing population variance only in the county commissioner districts, should be granted.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Galveston County, Texas has a population of over 150,000 citizens and is subject to the section 5 preclearance requirements of the 1965 Voting Rights Act ("the Act"). *See* 42 U.S.C. § 1973c, *as amended* by Pub. L. No. 109-246, 120 Stat. 577 (2006). On or about October 14 and 19, 2011, Galveston County submitted a plan to modify its Benchmark Map to the Attorney

---

[1] It should be noted that the defined areas within which justices of the peace and county commissioners are elected are referred to as "precincts." Because the defined areas within which voters may cast ballots are also referred to as "precincts," I will refer to the former as "districts."

[2] On November 30, 2011, Timothy Paulissen, Todd Kinsey and Heidi Thiess filed a motion to intervene pursuant to Federal Rule of Civil Procedure 24(a) and (b). The Court granted the intervenors' motion but denied their motion for continuance, setting December 1, as the date for presentation of their evidence.

[3] The Benchmark Map is the last legally approved map used by Galveston County in its local elections. In this case, it is the 2001 map.

General of the United States, and filed a companion declaratory judgment action in the District Court for the District of Columbia. *See Galveston County, Texas v. United States of America, et al.*, (CA. No. 1:11-CV-1837-ABJ-JRB-RMC).

At the time the plaintiffs filed their suit for a temporary restraining order and preliminary injunction [November 4, 2011], neither the Attorney General nor the District Court for the District of Columbia had acted on Galveston County's plan to implement voting changes. The preclearance process permits the Attorney General 60 days to address a new redistricting plan. And, in the event the Attorney General determines that a plan is incomplete or lacks sufficient data for a proper evaluation, additional time or delay will occur. At the time of the issuance of this Memorandum and Order, the Galveston County Plan has not been precleared.

Galveston County has four single member district offices for county commissioners and one at-large district. *See* Tex. Const. Art. 5, § 18(a). It is undisputed that Galveston County's plan reduces the number of offices for justice of the peace and constable.

With regard to the county commissioner districts, Galveston County has one single member district [district 3], a majority-minority district, represented by an African-American. A second district has a minority population of 41.2 percent [district 1], which seat is currently held by a non-Hispanic Caucasian. The remaining two county commissioner districts and the county-wide position are held by three non-Hispanic Caucasians. Because of a population variance, Galveston County determined, and without dispute, that the county commissioner districts, in particular, dictated a population reappointment.

III.   **THE CONTENTIONS OF THE PARTIES AND TESTIMONIAL SUMMARIES**

   *A.     The Plaintiffs' Contentions*

The plaintiffs do not dispute that Galveston County has suffered population losses in commissioner districts 1 and 3, and/or that increases in population have occurred in districts 2 and 4. They dispute the manner that Galveston County and the intervenors would apportion the population to reduce the deviation so that the "one-man, one-vote" requirement is met. *See Baker v. Carr*, 369 U.S. 186 (1962). In this regard, the plaintiffs point out that the intervenors' plan would satisfy the population variance by moving minority voting precincts from district 1 into district 3, and by shifting non-minority voting precincts to district 1 from district 4. The plaintiffs argue that these adjustments would move minorities from district 1 into district 3, a district that is already a majority-minority district, capable of reducing the opportunity for district 1 to remain or become a coalition district whereby a minority might be elected or might otherwise impact voting outcomes. The plaintiffs' argument rests on testimony that Galveston County's greatest population growth over the past 10 years was among African-Americans and Hispanics.

The plaintiffs also dispute Galveston County's claim that it is not a proper party to this suit. They contend that the evidence, even that presented by the intervenors, supports the fact that the political parties' [Republican and Democrat] contract with Galveston County to conduct primary elections, and are merely in-charge of collecting ballots for Galveston County. Otherwise, the plaintiffs contend, Galveston County sets the date(s) for elections, prints the ballots, provides voting machines and tabulates the votes.

Finally, the plaintiffs assert that their suit is not premature and the Court should proceed and make any necessary adjustments to satisfy the population variance since there is no sign that

a favorable decision from the Attorney General or the District Court for the District of Washington, D.C. is forthcoming and will be issued before the filing deadline of December 15, 2011.

### B.   Galveston County and Intervenors' Contentions

Galveston County and the intervenors contend, without dispute, that districts 1 and 3 are under-populated by 16.03% and 12.76%, respectively. They assert that simply adding 10,000 residents to district 3, while resulting in a reduction of the minority population in that district, the addition will not affect minority performance. Simultaneously, they argue, the addition will meet the "one person, one vote" requirement and thereby cure the population deviation that currently exists. *See Baker*, 369 U.S. 186.

Separately, Galveston County argues that the plaintiffs' suit is premature in that the statutory deadline for preclearance is December 15, 2011. Hence, Galveston County contends, there is time for the Attorney General or the District Court of Columbia to act. Therefore, the Court should cancel its preliminary injunction and defer to the Attorney General. In an additional argument, Galveston County asserts that this Court should not go forward because Galveston County is not a proper party in this suit. Because primary elections are to be conducted by the respective political parties, the two political parties are proper and necessary parties to this litigation.

### C.   Summary of Processes Used by the Plaintiffs and Intervenors

The plaintiffs present expert testimony from George Korbel in support of their proposed plan. He testified that he based his proposal and conclusions on six factors. *See* [Plaintiffs Exhibit No. 2, Galveston County Interim Apportionment GE 193]. First, he sought to comply with section 5 of the Act. Next, he considered the population deviation and the "one-person,

one-vote" requirement of *Baker v. Carr*.   He then sought to avoid or minimize cutting jurisdictional lines.   As well, he sought to avoid cutting voting precinct lines while making population adjustments.   Fifth, he sought to avoid pairing incumbents in a single district.   And, finally, he attempted to deviate as little as possible from the last legal plan, the Benchmark Map.

During his testimony, Korbel stated that he had observed the voter turnout numbers and election information presented by the state of Texas in *Perez v. State of Texas*, [Civ. Action No. 5:11-CA-00360 (W.D. Texas, 2011)].   In his view, the changes to the Benchmark Map that he proposes: (a) did not modify minority and/or minority opportunity districts 1 and 3.   He further observed that the fastest population growth occurred in districts 2 and 4.   His sentiments, nevertheless, were to leave districts 1 and 3 as they are under the Benchmark Map and make adjustments between districts 2 and 4.   This approach results in a top to bottom deviation of 6.8% when measured against the ideal.[4]   Korbel testified that, while this percentage deviation is not 0%, it adheres to section 5 and addresses the "one-person, one-vote" equal protection requirement, although imperfectly.

The intervenors also presented expert testimony.   They called Thomas Brooks Hofeller, who testified concerning his observations of the plaintiffs' plan and his own plan.   In his opinion, a court-ordered plan should "aim for equality."   While a 0% deviation cannot always be achieved, he stated, deviations should be "kept low" in any interim court-ordered plan.   Hofeller testified that because of the short notice in requesting his testimony, he had not studied the Benchmark Map to determine how it relates to his proposed plan, or to that of the plaintiffs.   His proposal, therefore, was based on communications with a Galveston County representative and a review of Galveston County's proposal now before the Attorney General.

---

[4] District 1 reveals a -2.8% in population, while district 4 reveals a 4% deviation.   Together they total 6.8% deviation.

Hofeller also testified that he did not analyze the voting data for the commissioner districts to determine how minority candidates had performed in non-minority majority districts. Therefore, he could not testify what impact his plan might have on minorities in districts 1, 2 and 4 as it relates to whether minorities might suffer setbacks by his plan. Nor had he looked to see how, for example, moving voting precincts, 105, 106, 108 and 115 into commissioner district 3, while removing from district 3 voting precincts 339, 341, 344, 389 and 398, might result in "packing" minorities into one district, district 3, and thereby negating in district 1, a minority opportunity or coalition district. *See* [Intervenors' Exhibit No. 1, Intervenors' Plans A and B]. Finally, Hofeller testified that he was unaware of whether the Hispanic and African-American growth, over the past 10 years, had exceeded the growth of the non-Hispanic Caucasian population.

## IV.   LEGAL STANDARD

Section 5 of the Voting Rights Act of 1965 (42 U.S.C. § 1973c), requires designated political subdivisions to obtain federal preclearance, either from the Attorney General of the United States or from the District Court of the District of Columbia, before implementing a change in its voting laws. *Lopez v. Monterey County* [*Lopez II*], 525 U.S. 266, 270 (1999). Therefore, when an interested party determines that a political subdivision's plan has not been precleared, that party may file a suit under the Act challenging the imposition of the non-precleared plan. In this circumstance, the Chief Judge of the United States Court of Appeals is required to appoint a district court composed of three judges pursuant to 28 U.S.C. § 2284, to hear the evidence and determine, if appropriate, any necessary alterations to Benchmark Map or the last legal plan.

A section 5 enforcement court is authorized to implement a temporary restraining remedy where delay would seriously jeopardize implementation of an election cycle. *See Lopez v. Monterey County [Lopez I]*, 519 U.S. 9, 23-24 (1996) (internal citations omitted). The issue before the Court in such a case is what temporary remedy, if any, is appropriate. *Lopez I*, 519 U.S. at 23-24. When constructing an interim court-ordered plan, an enforcement court is to be guided by a stricter standard than the state or county political machinery. The objective is a *de minimis* population deviation. *See Chapman v. Neir*, 420 U.S. 1, 26-27 (1975). In accomplishing this task a temporary court-ordered plan should avoid any taint of discrimination and be fashioned [apportioned] in a manner that meets the standards of sections 2 and 5 of the Act. *See Connor v. Finch* 431 U.S. 407, 415 (1977); *see also McDaniel v. Sanchez*, 452 U.S. 130, 149 (1981).

The Equal Protection clause requires that electoral districts achieve population equality as nearly as possible. *See Abrams v. Johnson,* 521 U.S. 74, 98 (1997). Therefore, a court-ordered plan should, if possible, achieve the goal of population equality with little more than *de minimis* variation. *Abrams*, 521 U.S. at 98. However, absolute population equality many not be possible in local redistricting and should not be done at the expense of the Act. *Id.; see also Abate v. Mundt*, 403 U.S. 182, 185 (1971).

The "one-person, one-vote" [Equal Protection] standard applicable to county commissioner districts does not apply to justice of the peace and constable precincts. *See Chisom v. Roemer*, 501 U.S. 380 (1981). Hence, where a request for preclearance of justice of the peace and constable precinct lines has not been precleared, and the upcoming election cycle is imminent, an enforcement court may permit elections to go forward in accordance with the last legally-permitted plan even though the plan does not meet all constitutional requirements. *See*

*Upham v. Seamon*, 456 U.S. 37, 43 (1982); *Corder v. Kirksey,* 639 F.2d 1191, 1196 (5th Cir. 1981); *Chisom v. Roemer*, 853 F.2d 1186, 1189 (5th Cir. 1988); *Watkins v. Mabus*, 771 F.Supp. 789, 797 (S. D. Miss. 1991).

## V.    DISCUSSION AND ANALYSIS

### A.    *Benchmark Map Adequately Serves Justices of the Peace and Constables*

I view the Court's task as making adjustments to the Benchmark Map (2001) to bring the population deviations within the "one-person, one-vote" principle as it relates only to the county commissioner districts. *See Baker*, 369 U.S. 186; *see also Gray v. Sanders*, 372 U.S. 368, 381 (1963). In the process of making adjustments, I am mindful of the strictures of *Connor v. Finch*, that adjustments based on population variances cannot violate sections 2 and 5 of the Act.

According to the 2010 Census, Galveston County enjoys a population of 291,309 residents. Hence, an equalized population for the four county commissioner districts would result in 72,827 residents in each of the four districts. The evidence shows that district 1 has 61,152 persons, district 2 has 76,684 persons, district 3 has 63,534 and that district 4 has 89,939. These population variances result in a 39.53% top to bottom deviation.[5]   Therefore, the Benchmark Map cannot be utilized to conduct elections for county commissioner precincts due to a population variance in excess of 10%. *See Swann v. Adams*, 385 U.S. 440, 443-44 (1967). This legal impediment, the population variance, is of no concern in the case of the election of justices of the peace or constables. *See Chism v. Roemer,* 501 U.S. 380 (1991). In fact, the parties agree that the one-person, one-vote principle, does not apply to the justice of the peace/constable precincts. Therefore, as it relates to the offices of justice of the peace and

---

[5] District 1, containing 61,152 residents, is 11,675 residents below the ideal population of 72,827. This disparity constitutes a deviation of -16.03%. District 4, containing 89,939 residents, is 7,112 residents above the ideal population of 72,827. This disparity constitutes a deviation of 23.50%. Together the two deviations constitute a 39.53% deviation.

constable, the Benchmark Map sufficiently defines the precincts and boundaries for the respective offices and Galveston County.

      *B.*    *Galveston County's Policymaking Authority Versus Federalism*

      The defendant, Galveston County, raises inferentially, perhaps directly, the issue of federalism as it relates to its budgetary autonomy. More specifically, Galveston County argues that under its policy making authority, granted by the state Constitution, it has determined that fewer constables and justices of the peace are budgetarily appropriate. Hence, under the plan submitted to the Attorney General and the District Court of the District of Columbia, Galveston County exercised its discretionary authority to determine the size of its budget for constables and justices of the peace and that exercise is reflected.

      Without doubt, a county government may exercise its discretion on budgetary and policy making matters. However, Congress' power to legislate under the federal Constitution, *i.e.,* the Fourteenth and Fifteenth Amendments to guard against voting law changes that give rise to a discriminatory effect in a jurisdiction that requires federal preclearance is a proper exercise of its constitutional authority. *See Lopez II,* 525 U.S. at 282-83. The Supreme Court recognized that the Voting Rights Act authorizes federal intrusion into sensitive areas of county policy making, but pointed out in *Miller v. Johnson*, 515 U.S. 900, 926 (1995), and in *Rome v. United States*, 446 U.S. 156, 179 (1980), that the Reconstruction Amendments, by their nature, contemplated instances of intrusion. Therefore, such intrusion is "within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." when it is necessary to enforce the Act. *See Lopez II*, 525 U.S. at 282-83. While the decision to reduce the number of constables and justices of the peace may be a good and honorable act and certainly within Galveston County commissioners' authority, that authority is trumped here by the

mandate of section 5 of the Act because the plan has not obtained preclearance. *See Lopez v. Monterey County, California*, 519 U.S. 9, 20 (1996) (citing to *Clark v. Roemer*, 500 U.S. 646, 652-653 (1991); *McCain v. Lybrand*, 456 U.S. 236, 249 (1984)).

**VII.   CONCLUSION**

I am of the opinion that the plan(s) submitted by the intervenors [Intervenor Exhibits 1 and 2 (Plans A and B)] do not meet the requirements of section 5 of the Voting Rights Act and, therefore, cannot be adopted by the Court.   While the plans meet the *de minimus* population deviation standards in, for example, *Chapman v. Meier,* they fail in other significant respects. First, the plans fail to observe their relationship to the Benchmark Map.   The Benchmark Map is the most likely starting point because it is the last legal plan.   Hofeller admitted as much, yet defaulted to the "one-person, one-vote" necessity.   In doing so, he failed to account for the fact that his plan A would effectively reduce the Hispanic and African-American voting age population percentage when compared against the Benchmark Map by approximately 7.4%. Plan B would, moreso, reduce that same population by approximately 9%.   He admitted that to adopt either of his plans would mean that "minorities would form a smaller component of the voting population in commissioner district 1."   And, assuming that one were to look at commissioner district 1 as a coalition district, one would "look at the citizen voting age population as compared to the census voting age population."   Yet, Hofeller did not analyze that data.   Therefore, I am of the opinion that the intervenors' plan should not be adopted by the Court.

The plan submitted by the plaintiffs, specifically plaintiffs' Exhibit Number 2, meets the requirements for a court-ordered plan of redistricting as mandated by *Chapman* (*de minimus* population deviations) and *McDaniel v. Sanchez*, 452 U.S. 130, 147 (1981) (compliance with the

Voting Rights Act). In developing his plan, Korbel observed the equal protection considerations as well as those for sections 2 and 5 of the Act. Of key importance in reaching a one-person, one-vote goal for the citizens of Galveston County, is the recognition that the Act should not be violated. Exhibit 2 accomplishes that challenge without modifying minority opportunity districts 1 and 3. As well, it reduces the population deviation from a top to bottom deviation of 39.53% to a top to bottom deviation of 6.8% with an average deviation of 2.0%. The plan maintains district 1 as a strong Hispanic or minority opportunity district in which the Hispanic population percentage is 29.9% and the combined Hispanic and African-American percentage of the population is 41.2%.

Other strengths of the plaintiffs plan are, it does not split voting precincts, does not pair incumbents and does not cut jurisdictional lines in a manner that is detrimental to the Act or "one-person, one-vote" strictures. Finally, while the top to bottom deviation is not 0%, the trade-off is that it is below 10% and complies in fact and spirit with the law. Hence, I find that it comports with the non-retrogression requirements of section 5 of the Act. *See Beer v. United States*, 425 U.S. 130, 141 (1976); *Upham v. Seamon*, 456 U.S. 37, 44 (1982). I would, therefore, adopt the plaintiffs' plan presented in Exhibit 2 for the county commissioner districts, and not permit Galveston County to proceed with elections on either its non-precleared plan or its last legal plan, as both violate section 5 of the Act.

SIGNED at Houston, Texas this 9th day of December, 2011.

Kenneth M. Hoyt
United States District Judge



| District | Deviation | Total | Anglo | Black | Hisp | B-H | Other | %A | %B | %H | %BH | %O |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | -3,545 | 69,082 | 38,505 | 8,405 | 21,146 | 29,538 | 3,139 | 55.1 | 11.9 | 29.9 | 41.2 | 4.1 |
| | -4.9% | Total | | | | | | | | | | |
| | -3.9% | V.AP. | 54,940 | 5,905 | 14,033 | 19,97 | 2,518 | 59.1 | 10.8 | 25.9 | 36.4 | 4.6 |
| 2 | -56 | Total | 51,683 | 1,674 | 11,12 | 15,658 | 3,543 | 13.9 | 6.5 | 15.5 | 21.1 | 4.5 |
| | -0.8% | V.AP. | 21,133 | 2,938 | 113 | 16,00 | 1,133 | 5.9 | 5.6 | 13.6 | 19.0 | 4.2 |
| 3 | -308 | Total | 72,519 | 25,531 | 21,635 | 46,758 | 1,138 | 34.3 | 34.9 | 28.8 | 63.8 | 3.0 |
| | -0.4% | V.AP. | 50,986 | 18,985 | 15,508 | 31,813 | 1,168 | 33.6 | 33.6 | 28.2 | 55.2 | 3.1 |
| 1 | 3,518 | Total | 76,115 | 3,806 | 11,167 | 14,958 | 4,115 | 1.9 | 5.1 | 1.9 | 19.7 | 5.7 |
| | 1.0% | V.AP. | 55,650 | 2,512 | 1,361 | 5,911 | 2,935 | 1.3 | 1.1 | 13.0 | 1.6 | 5.3 |

Top to: 4965   Total 287 909
Bottom
Deviation 6.6%   Ideal 72 627 25







